Jones, Purvis & Co. v. Hobbs.

JONES, PURVIS & CO., v. W. W. HOBBS, et al.

1. PUBLIC PRINTING. *Act of* 1873. On March 21, 1873, an Act was passed by the Legislature repealing these provisions of the Code which created the office of Public Printer, and providing for his election, but with a proviso that "this Act shall in no way affect the rights and duties of the present Public Printers." Afterwards, an Act, taking immediate effect, was passed, authorizing the Secretary of State, etc., to award the public printing to the lowest bidder, etc. On March 25, 1873, an Act was passed requiring the assessor to furnish tax lists to certain persons, and making it the duty of the Comptroller to furnish the Clerks of the County Courts the printed forms for listing, to be distributed by the Clerks to the assessors, etc.

*Held,* It is obvious that the Legislature intended to require the Comptroller to have blank forms printed for distribution by the County Court Clerks to the assessors, who were then to furnish them to the tax payers. The blank forms ordered to be printed by §31 of the Act·of 1873, ch. 118, fall within the meaning of the term "public printing," as used in the Statutes. Whatever printing is done by order of the Legislature, or in pursuance of a law, for the State, is public printing, whether it be printing the journals and acts of the Legislature, or legal opinions, or whether it be in the shape of job work. The printing of the blank forms under §31 of the Act of 1873, ch. 118, was public printing, in the shape of job work, for the reason that it was to be done for the public, in pursuance of law.

2. THE PUBLIC PRINTER IS A PUBLIC OFFICER, ETC. *Contracts, impairing of. Constitution.* The Public Printer is an officer of the State, but since the contracts designed to be protected by §10 of the first Article of the Constitution are contracts by which perfect rights, certain, definite, fixed, private rights of property are vested, it follows that Jones, Purvis & Co. held the office of Public Printers as a public trust, subject to the power of the Legislature to discontinue it at any time, or to be resigned at their pleasure at any time by them, and not as a contract protected from impairment under the Constitution of the United States. From the date of the repealing Act they ceased to be officers of the State, and could claim no rights accruing after the date

8—VOL. 4.

Jones, Purvis & Co. *v.* Hobbs.

of the repealing Act. The repeal, however, could not affect any rights which had vested before their office was abolished. These would be protected by the Constitution of the United States, and these are the only rights intended to be protected by the proviso to the second section of the repealing Act.

Case cited: 2 Sneed, 369.

Authorities cited: Burrell's Law Dictionary, 257; 20 J. R., 493; 2 Blackstone, 36; 5 N. Y., 285; 26 Ark., 139; 10 How., 416; Cooley's Const. Lim., 276.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court. W. F. COOPER, Chancellor.

T. M. STEGER for Jones, Purvis & Co.

J. B. HEISKELL for Hobbs.

NICHOLSON, C. J., delivered the opinion of the Court.

Jones, Purvis & Co. were elected Public Printers of the State on November 2, 1871, and were to hold their office for two years. Before entering upon their duties they gave bond in $5,000, conditioned to execute the printing according to law. The prices at which the public printing was to be done were fixed by the Code.

On March 21, 1873, an Act was passed by the Legislature repealing those provisions of the Code which created the office of Public Printer, and providing for his election; but with a *proviso* that "this Act shall in no way affect the rights and duties of the present Public Printers."

The Act then provided, that the public printing authorized by law to be done for the State shall be awarded to the lowest bidder, and the Secretary of State, Comptroller, and Treasurer were appointed Commissioners of Printing, with full power to contract for and superintend the same under this Act. This Act took effect from the date of its passage, March 21st, 1873.

On March 25, 1873, the Legislature passed "an Act to provide more just and equitable laws for the assessment and collection of revenue," and to take effect from and after April 1, 1873. By §31 of this Act it was provided, that "the assessor shall furnish to every person, company, firm, or corporation required to list property for taxation, the proper blanks for that purpose; and it is hereby made the duty of the Comptroller to furnish the Clerks of the County Courts of this State the printed forms for listing and assessing property, to be distributed by the said Clerks to the several assessors for districts and wards. Said blanks shall enumerate all exemptions, and shall contain a synopsis of the laws for the assessment of property," etc.

Soon after the passage of this Act, a question arose between W. W. Hobbs, the Comptroller, and Jones, Purvis & Co., the Public Printers, whether the printing of the blank forms provided for in the section just quoted was public printing, and if so, whether Jones, Purvis & Co. were entitled to execute it, as Public Printers, or whether the Comptroller might not contract for the execution of the work by other printers? Jones,

Purvis & Co. filed their bill, enjoining Hobbs, and certain other printers with whom Hobbs was about contracting, from consummating their contract, and praying for a specific performance of their contract as Public Printers.

On April 26, 1873, Jones, Purvis & Co. and W. W. Hobbs entered into an agreement to the effect that Jones, Purvis & Co. were to go on and execute the work, and "if, upon final hearing, the Court shall decide that complainants are entitled to do the work, then complainants are to receive as compensation the amount allowed by law to the Public Printers for such work. But if the Court should decide, under the facts of this case, the Comptroller is authorized to give out this printing to the lowest bidder, then the complainants are to receive a compensation no more than $2,450 (the lowest bid received by Hobbs), which amount is to be paid them at once." The amount claimed by Jones, Purvis & Co., according to the prices allowed by law for public printing, was $5,016 20. This agreement was made an exhibit to an amended bill filed by Jones, Purvis & Co., in which they sought to have this agreement enforced. Under this agreement Jones, Purvis & Co. proceeded to execute the work, and upon its completion the blank forms were delivered to John C. Burch, successor of W. W. Hobbs, who distributed the same to the several County Court Clerks. Burch was made a defendant in 1873, and after demurring upon the ground that the State could not be sued, filed his answer, insisting that the

printing in question was not public printing, as contemplated by law, and that the Comptroller was only required to furnish blank forms to the Clerks of the County Courts, and that the assessors were required to furnish the taxpayers with the blanks at their own expense.

But it was agreed by the solicitors of Burch and of Jones, Purvis & Co., that the Court should decide the two following questions, without regard to the state of the pleadings, viz:

1. Whether the printing referred to in the pleadings and proof is public printing, as those terms are used in the laws of Tennessee?

2. Whether the Comptroller was authorized to do more at the expense of the State than to furnish the Clerks of the County Courts with printed forms for listing and assessing property, to be distributed by said Clerks to the several assessors, from which forms said assessors could have printed the blanks to be furnished to the taxpayers; in other words, whether the Comptroller or assessors were to furnish the blanks that were to be used by taxpayers."

The case was heard on February 23, 1874, by Chancellor Cooper, who held that " under the Act of March 25, 1873, ch. 118, it was the duty of the Comptroller of the Treasury to have printed and furnish all the forms or blanks necessary to be distributed to, and used by the tax payers for listing their property for taxation. And that the printing of said forms or blanks was a part of the public printing which

the complainants, as the Public Printers, were entitled and bound in their character as Public Printers to do, and that complainants are entitled to receive the compensation allowed by law to the Public Printers, etc.

The Comptroller of the Treasury has brought the case to this Court by writ of error.

The Chancellor's construction of §31 of the Act of 1873, ch. 118, is clearly correct. Whatever ambiguity there is in the language of the section is produced by the use of the words "blanks and forms," upon the assumption that they meant different things. But it is manifest, on the face of the section, that they were used as convertible terms, meaning the same thing. So understanding these words, it is obvious that the Legislature intended to require the Comptroller to have blank forms printed for distribution by the County Court Clerks to the assessors, who were then to furnish them to the tax payers.

We think it equally clear, that the Chancellor was correct in the holding that the blank forms ordered to be printed by §31 of the Act of 1873, ch. 118, fall within the meaning of the term "public printing," as used in the Statutes. Whatever printing is done by order of the Legislature, or in pursuance of a law, for the State, is public printing, whether it be printing the journals and acts of the Legislature, or legal opinions, or whether it be in the shape of job work. The printing of the blank forms under §31 of the Act of 1873, ch. 118, was public printing, in the shape of job work, for the reason that it was to be

done for the public, in pursuance of law. If this work had been executed before the passage of the Act of March 21, 1873, repealing the law which created the office of Public Printer, no question could be raised as to the right of the Public Printers to claim the job, and to receive the compensation fixed by the law then in force.

But we have seen that the Act directing the Comptroller to have the blanks printed was passed after the Act which abolished the office of Public Printer, and that when the job was to be given out, the law then in force required the Comptroller, Secretary of State, and Treasurer, as Commissioners, to let out the work to the lowest bidder. It is clear that it was the right and the duty of these Commissioners to procure the printing of the blanks in the manner prescribed by the Act of March 21, 1873, unless Jones, Purvis & Co. were entitled to the job, by virtue of a contract with the State, or because the repealing Act reserved to them the right to execute the job.

The office of Public Printer was created by the Legislature—the Constitution making no provision for such an office. Its term of duration, its duties, and its compensation are prescribed by the Legislature, and a bond required for the faithful discharge of its duties. These are all the usual characteristics of an office of public trust, and in §2 and §5 of the Code it is expressly denominated an office. Mr. Burrell, in page 257 of his Law Dictionary, says: "the *idea* of an office clearly embraces the ideas of tenure, duration,

fees or emoluments, rights and powers, as well as that of *duty*." In 20 J. R., 493, Platt, J., defines it, "an employment on behalf of the Government, in any station or public trust, not merely transient, occasional, or incidental." Blackstone, 2 vol., p. 36, defines it, "a right to exercise a public or private employment, and to take the fees and emoluments thereto belonging. Under each and all of these definitions the Public Printer is an officer of the State, and he is so designated in the law creating the office.

It was said in 2 Sneed, 369, that "where an office is created by Statute, it is wholly within the control of the Legislature. The term, the mode of appointment, and the compensation, may be altered at pleasure, and the latter may even be taken away without abolishing the office."

The contracts designed to be protected by §10 of the first Article of the Constitution are contracts by which perfect rights, certain, definite, fixed, private rights of property are vested. These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or State government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require.

The case of *Butler* v. *Penna,* 10 How., 402, is a leading case on this question. The facts were as follows: Butler and others were appointed Canal Commissioners by the Governor of Pennsylvania, on the 1st of February, 1843, in pursuance of an Act passed in

1836, to hold the office for one year, with a compensation of $4 per day. After they entered upon their duties, to wit, on April 18, 1843, the Legislature repealed the Act for their appointment by the Governor, and requiring them to be elected by the people, this part of the repealing Act to take effect on January 1, 1844. The same Act reduced the compensation to $3 per day, this part taking effect from its passage. The Commissioners served until January, 1844, and then retained the money in their hands, claiming $4 per day. They were sued by the State, and judgment rendered for the difference between $4 and $3 per day. They appealed to the United States Supreme Court, where the judgment was affirmed.

The question was whether the appointment of the Governor was a contract which was violated by the repealing Act, and therefore void, because it impaired the obligation of the contract, under Art. 1, §10 of the United States Constitution?

In delivering the opinion of the Court, Justice Daniel said: "The selection of officers, who are nothing more than public agents for effectuating of public purposes, is a matter of public convenience or necessity, and so, too, are the periods of the appointments of such agents; but neither the one nor the other of these arrangements can constitute any obligation to continue such agents, or to re-appoint them, after the measures which brought them into being shall have been found useless, shall have been fulfilled, or shall have been abrogated as even detrimental to the well being

of the public. The promised compensation for services actually performed and accepted, during the continuance of the particular agency, may undoubtedly be claimed, both upon principles of compact and of equity; but to insist beyond this upon the perpetuation of a public policy either useless or detrimental, and upon a reward for acts neither desired nor performed, would appear to be reconciliable with neither common justice nor common sense."

Public officers, though salaried, are not held by contract or grant, and unless there be some special restraints in the State constitution, they are under the complete control of the Legislature, and they may be abolished, or the term thereof reduced, the salaries may be reduced, or new duties imposed. 5 N. Y., 285; 26 Ark., 139.

Mr. Sedgewick, in his work on the Construction of Statutory and Constitutional Law, p. 599, after reviewing the cases in which legislative acts are held to create contracts, and treated accordingly, adds: "But we have already stated that in the term contracts are not included rights, or rather interests, growing out of measures of public policy. So, no contract is created by a Statute fixing the emoluments of a public office, and where a Pennsylvania Act reduced the *per diem* compensation of a public officer during the term for which the office, with its remuneration, had been fixed by a previous Statute, it was held that the original law created no contract. 10 How., 416. In the same case it was held, that "the appointment to and

the tenure of an office created for the public use, and the regulation of the salary affixed to such an office, do not fall within the meaning of the section of the Constitution relied on by the plaintiff in error (§10, Article 1); do not come within the import of the term contract, or, in other words, the vested, private, personal rights thereof intended to be protected."

Mr. Cooley, at page 276, of his Const. Lim., sums up the result of the authorities to be: That "where the State employs officers as the mere agencies of government, it must have the power to discontinue the agency whenever it comes to be regarded as no longer important. The framers of the Federal Constitution did not intend to restrain the States in the regulation of their civil institutes adopted for internal government. They may, therefore, discontinue offices at any time, according to the existing legislative view of State policy, unless forbidden by their own Constitutions from doing so."

It follows that Jones, Purvis & Co. held the office of Public Printers as a public trust, subject to the power of the Legislature to discontinue it at any time, or to be resigned at their pleasure at any time by them, and not as a contract protected from impairment under the Constitution of the United States. From the date of the repealing Act they ceased to be officers of the State, and could claim no rights accruing after the date of the repealing Act. The repeal, however, could not affect any rights which had vested before their office was abolished. These would be protected by the Con-

stitution of the United States, and these are the only rights intended to be protected by the proviso to the second section of the repealing Act.

We are, therefore, of opinion that the Chancellor erred in holding that complainants were entitled to compensation for the printing of the blanks at the rates fixed by the law which was in force when they were elected Public Printers.

The decree will be reversed, and the bill dismissed with costs of this Court and the Court below.